# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

JOHN R. HALIK,                )
           Plaintiff,       )
                            )
      v.                    )     CAUSE NO.: 2:09-CV-379-PRC
                            )
MICHAEL J. ASTRUE, Commissioner   )
of Social Security,               )
           Defendant.       )

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff John R. Halik on November 12, 2009, and a Motion for Summary Judgment [DE 10], filed by Plaintiff on March 1, 2010. Plaintiff requests that the February 24, 2009 decision of the Administrative Law Judge denying him disability insurance benefits be reversed or, alternatively, remanded for further proceedings. Because the ALJ did not address Plaintiff's limitation as to interaction with supervisors in his assessment of Dr. Kern's medical source opinion and Plaintiff's residual functional capacity, the Court grants the request and remands this case for further proceedings consistent with this Order.

## PROCEDURAL BACKGROUND

Plaintiff filed an application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") benefits on October 30, 2006, alleging an onset date of October 9, 2006. Plaintiff's applications were denied initially and on reconsideration, and a request for hearing was timely filed. On December 22, 2008, Plaintiff appeared and testified at a hearing before Administrative Law Judge Joel G. Fina ("ALJ"), where he was represented by Attorney Edward Lawhead. John S. Halik and Elaine Reynolds testified as witnesses, and James Breen testified as a vocational expert.

On February 24, 2009, the ALJ issued an unfavorable decision denying benefits. The ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.

2. The claimant has not engaged in substantial gainful activity since October 9, 2006, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3. The claimant has the following severe impairments: bipolar disorder and alcohol abuse (20 CFR 404.1521 et seq. and 416.921 et seq.).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of work at all exertional levels but with nonexertional limitations. The claimant is limited to simple, routine, repetitive work in a low stress working environment with relaxed or flexible production rate requirements. Additionally, he can have only occasional interaction with coworkers or the general public.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born [in] 1980 and was 26 years old, which is defined as a younger individual, on the alleged disability onset date. He remained a younger individual at the time of his hearing (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 9, 2006 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. 62-72). Plaintiff then filed a Request for Review of the hearing, which was denied on September 21, 2009, making the ALJ's decision the final decision of the Commissioner.

On November 12, 2009, Plaintiff filed the instant civil action for judicial review of the Commissioner's final decision. Plaintiff filed his Opening Brief on March 1, 2010. The Commissioner filed a response on June 16, 2010, and Plaintiff filed a reply on June 28, 2010.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

## FACTUAL BACKGROUND

### A. Vocational Background

Plaintiff was 28 years old at the time of the ALJ's decision and had a high-school education.

### B. Plaintiff's Testimony

Plaintiff testified that he had bipolar disorder, that he was compliant with taking his medication, and that he had been free of manic episodes for awhile. Plaintiff explained that during his previous manic phases he would go on spending sprees and purchase unnecessary items, would not be able to sleep normally, and would "rac[e] around." Plaintiff stated that he regularly felt depressed but taking Lithium helped his symptoms. He also testified that he lived with his father and had not ingested any illegal drugs in four years.

Plaintiff stated that he had difficulty remembering and understanding detailed instructions. He indicated that he sometimes felt stressed about performing complex tasks or not completing a task on time and also had problems with concentration. Plaintiff testified that although he was usually able to keep pace with his co-workers, he would fall behind at times. He indicated that, if he fell behind, he was able to get back on task. Plaintiff stated that he sometimes missed work because he overslept after having a manic episode the night before, but slept normally when he took his medication.

Plaintiff testified that he got along with co-workers at times, but other times he would get aggravated, "a little pushy," and not want to be around people. He stated that he liked working with others, but had a difficult time taking orders from someone else in the group when he disagreed with the way that person wanted a task done. He indicated that at those times, he grew belligerent or went home. Plaintiff stated that he had jobs where he had no problems with his bosses, but held other jobs where he had difficulty taking orders. Plaintiff indicated that he lost some jobs because his supervisor did not like his response to criticism. Plaintiff testified that he also previously worked around the general public. Plaintiff testified that the longest job he ever held was for approximately three years. He further testified that he had last worked in April 2008 and that he quit after one month because he could not keep up with the work and "just had problems taking the orders" from his supervisor.

Plaintiff indicated that since his alleged onset date of October 9, 2006, he had worked three to five full-time jobs. He testified that the longest job he held during this time period was for almost one year. Plaintiff testified that he had also worked for a temporary service doing a part-time service job for a property management company, but left that job to work for Pepsi because it paid more

money.  He worked at Pepsi for about one month before he was fired.  Plaintiff stated that he went through a relapse of his bipolar symptoms after he started drinking heavily, stopped taking his medicine, went to work with no sleep, and ended up being charged with driving under the influence.  Plaintiff's last job involved cleaning carpets, dry-cleaning, and setting up desks.  He stated that he left this job after one month due to stress and had not made any attempts to work afterward.  Plaintiff testified that he still drank about six beers a week, against his doctors' orders.

## C.  Medical Evidence

*1. Evidence Predating Plaintiff's Alleged Onset Date of October 9, 2006*

Plaintiff was diagnosed with bipolar disorder in 2002.  In June 2004, Plaintiff was admitted to Southlake Center ("Southlake")  for three weeks.  Dr. Sheila Rao reported that Plaintiff had been using alcohol and drugs and became increasingly agitated in the weeks leading up to his admission.  At discharge, she diagnosed Plaintiff with bipolar disorder Type I and polysubstance abuse, assigned him a GAF score of 50, opined that his highest GAF score in the past year was a 60-65, and prescribed Lithium and Zyprexa.

Plaintiff saw Dr. Rao on an outpatient basis from June 2004 through February 2005.  On July 6, 2004, Plaintiff reported that he was taking his medications and sleeping well, but was hyperverbal.  One week later, he reported feeling calmer with increased medication.  From July 12, 2004, through February 2005, Plaintiff largely reported that he was medication compliant, calmer, and stable.  Dr. Rao noted that Plaintiff had a normal mood, thought processes, and affect.

In October 2004, consulting psychologist J. Theodore Brown, Jr., Ph.D. performed a mental health evaluation.  Plaintiff reported that he was very irritable and angry, primarily as a result of drinking.  He complained of frustration and low self-esteem.  He indicated that he enjoyed reading,

drawing, and writing when he was capable of doing so, often on a daily basis. Plaintiff reported that his father did most of the household chores, but he tended to his personal needs, drove, sometimes worked out, enjoyed sports, managed his money, had one good friend, and tolerated his family. Dr. Brown opined that Plaintiff had an appropriate affect, neutral mood, coherent thought processes, and fair insight. He diagnosed Plaintiff with bipolar disorder, intermittent explosive disorder, polysubstance abuse/dependency disorder, and alcohol abuse/dependency disorder. Dr. Brown then assigned Plaintiff a GAF score of 60 to 65 and gave him a fair prognosis.

On November 4, 2004, Dr. Rao wrote a letter in which she opined that, at that time, Plaintiff was "severely impaired and in need of continued intensive services." Tr. 790. That same day, state agency reviewing psychologist J. Gange completed a Psychiatric Review Technique form, in which he opined that Plaintiff was mildly impaired in activities of daily living and moderately impaired in social functioning and concentration, persistence, or pace.

On March 22, 2005, Plaintiff was voluntarily admitted to Southlake after he became manic during an appointment with Dr. Rao. One day later, Plaintiff admitted to Dr. Rao that he used alcohol and marijuana several times in the previous three weeks. She concluded that Plaintiff "was experiencing decompensation and bipolar disorder due to medication noncompliance." Tr. 338. She diagnosed him with bipolar disorder Type I and polysubstance abuse, assigned him a GAF score of 40, and opined that his highest GAF score in the past year was a 60. One week later, Plaintiff reported to a Southlake counselor that he drank over a case of beer a day every weekend, but he refused to participate in any substance abuse treatment if he had to pay for it. At discharge one week later, Dr. Peter Gallagher diagnosed Plaintiff with bipolar disorder and alcohol abuse and assigned him a GAF score of 90. Plaintiff was advised to attend 90 twelve-step meetings in 90 days.

One week later, Dr. Gallagher admitted Plaintiff for inpatient psychiatric care. Plaintiff was discharged on April 21, 2005, at which time Dr. Gallagher reported that Plaintiff had mild hypomania, but was "doing much better." Tr. 313. One month later and through December 2005, Dr. Gallagher reported that Plaintiff continued to do very well. According to Dr. Gallagher, Plaintiff displayed a normal mood and indicated that he had not been drinking alcohol.

In April 2006, Dr. John Kern saw Plaintiff for the first time. Dr. Kern believed that Plaintiff's bipolar disorder was "stable on [his] present meds." Tr. 295.

*2. Evidence Postdating Plaintiff's Alleged Onset Date of October 9, 2006*

Six months later, on October 9, 2006, Plaintiff reported that he was still abusing alcohol and staying out late on weekends. Plaintiff refused formal treatment for alcohol abuse. Dr. Kern again opined that Plaintiff's bipolar disorder was "stable on [his] present meds," but added that his alcohol dependence was "not really under control."

On October 18, 2006, Plaintiff was admitted to a psychiatric unit for three days with mania after drinking heavily and not regularly taking his Lithium. One week later, Plaintiff reported that he had been taking his medication since being discharged, but that he was still abusing alcohol. Plaintiff agreed to attend an Alcoholics Anonymous (AA) meeting. Dr. Kern again opined that Plaintiff's bipolar disorder was "more stable on [his] present meds," but that his alcohol dependence was "not really under control." Tr. 293.

In November 2006, Dr. Kern saw Plaintiff twice. At the first appointment, Dr. Kern noted that Plaintiff seemed to be "[o]nly moderately pressured" and "calmer." Tr. 285. Two weeks later, Dr. Kern noted that Plaintiff's mood "seem[ed] a bit more stable." Tr. 283. Plaintiff complained that he was "feeling a bit at loose ends," *id.*, but had no side effects from Abilify. At both

appointments, Plaintiff reported that he drank some beers, but not to intoxication, and again agreed to attend an AA meeting. Dr. Kern did not change his previous opinion. In December 2006, Plaintiff indicated that he went to some AA meetings, but found them too depressing. Dr. Kern did not change his previous opinions or Plaintiff's medications.

On January 3, 2007, consulting psychologist Patrick J. McKian, Ph. D., performed a mental status evaluation of Plaintiff. Plaintiff claimed that he did not use alcohol and had not abused drugs since 2002. Plaintiff complained of difficulty with concentration and memory, anxiety, and depression, and he realized that he had to stay on his medications. He stated that he also had problems with anger and was easily frustrated. Plaintiff reported that he was looking for a job, but that he often lost jobs because he was belligerent and refused to cooperate with his bosses. He claimed that he had 15 to 20 jobs since 2000. Plaintiff stated that he worked at his longest job for three years before being fired for "not listening," and he was most recently fired because of a disagreement with his boss. Tr. 427. Plaintiff reported that he could tend to his personal care, make meals, perform chores, do laundry, read the newspaper, watch television, and play softball with his friends. He also indicated that he enjoyed reading, drawing, spending time with his friends and sister, going to the movies, and going to the mall. Dr. McKian diagnosed Plaintiff with bipolar I disorder, most recent episode depressed, with a past history of psychotic features. He assigned Plaintiff a GAF score of 45.

Three weeks later, state agency reviewing psychologist Dr. Gange opined that Plaintiff was not limited in his activities of daily living; was mildly limited in social functioning; was moderately limited in concentration, persistence, or pace; and had no episodes of decompensation. He noted that Plaintiff had a history of "drinking alcohol instead of taking his medication," still currently

drank alcohol, and he opined that Plaintiff was "capable of simple repetitive tasks with sobriety." Tr. 432.

Dr. Kern's January 29, 2007 notes were virtually unchanged from those of three weeks earlier. About two months later, in April 2007, Plaintiff again reported that his mood remained stable and indicated that he would like to continue taking only Lithium. He reported having a few drinks once in awhile. Dr. Kern continued to opine that Plaintiff's bipolar disorder was "more stable on [his] present meds," but that his alcohol dependence was "not really under control." Tr. 878. Two months later, Plaintiff made a similar report that his mood remained stable, and Dr. Kern opined that Plaintiff remained stable on Lithium alone. He did not change his opinion as to Plaintiff's alcohol dependence, noted that Plaintiff had elevated readings from a liver function test, and reported that Plaintiff indicated he was not ready to stop drinking. Notes from an August 2007 session were virtually identical with Plaintiff again reporting that his mood was stable.

On September 24, 2007, Plaintiff reported to Dr. Kern that he had been drinking heavily and had not been taking his Lithium regularly. Dr. Kern noted that Plaintiff was hypomanic. He opined that Plaintiff was recently less compliant with taking his Lithium and less stable. He also opined that Plaintiff's uncontrolled alcohol dependence had produced "mood instability." Tr. 888. He referred Plaintiff to substance abuse treatment and added Zyprexa to his Lithium. Later that day, Plaintiff indicated that he had been drinking daily for the previous month. One week later, Plaintiff accepted the need for him to take his medication for stability and acknowledged that he had missed taking some of his Lithium during a period when he was drinking heavily. Dr. Kern opined that Plaintiff was still hypomanic and continued his medications. Five days later, Plaintiff enrolled in an alcohol dependence program, but failed to attend follow-up sessions. On November 20, 2007,

Plaintiff reported that he was still drinking, had another car accident, had missed some of his medication, had increased anger, and got into bar fights.

In December 2007, Plaintiff began seeing psychologist Andrew R. Farra, Psy. D., for weekly one-hour individual psychotherapy sessions. Dr. Farra noted that Plaintiff reported engaging in cycles of binge drinking, which caused him to miss taking his medication, and which, in turn, triggered manic episodes. One day later, Plaintiff reported to Dr. Kern that he had not drunk alcohol for a week and had a more stable mood.

Plaintiff continued to see Dr. Farra in December 2007 and January 2008. Dr. Farra opined that Plaintiff's hypomanic symptoms appeared to be in remission. During this time, Plaintiff acknowledged that he lost past jobs due to his anger and substance abuse. He worried that he might not be able to handle the stress of a new job and later declined a job as a corrections officer because he did not think working around criminals would be a good influence. Dr. Farra opined that Plaintiff's anger was clearly triggered by alcohol abuse, but the cause of his irritability had yet to be understood fully outside the context of his bipolar disorder. He further opined that Plaintiff's past actions on the job appeared to be motivated by self-sabotage and self-doubt. He also urged Plaintiff to avoid his past patterns of abstinence followed by binge drinking. By January 2008, Dr. Farra opined that Plaintiff was medication compliant and stable, and Plaintiff reported that he continued to maintain his sobriety.

In January and February 2008, Plaintiff reported to Dr. Kern that his affect had been "pretty stable," Tr. 913, 920; that he was compliant with taking his medications; and that he occasionally drank alcohol, but not to intoxication. Dr. Kern noted that Plaintiff was congenial and relaxed at both sessions. Dr. Kern opined that Plaintiff's bipolar disorder was "close to baseline," but that his

alcohol dependence remained "not really under control," causing increased readings in liver function tests and mood instability. Tr. 914, 921. He continued Plaintiff on Lithium and Abilify.

Plaintiff saw Dr. Farra twice in February 2008 and twice in March 2008. Plaintiff reported difficulty getting motivated to go to the gym and having social contact, but indicated that he was going to the gym and starting a new job. Dr. Farra stressed "the importance of a relapse prevention plan[,] given [Plaintiff's] history of cycling between abstinence and binge drinking associated with manic episodes and medication noncompliance." Tr. 916. Plaintiff reported that he quit the job after one month because he felt anxious about performing its more technical duties. He admitted that he probably did not give the job a chance. Dr. Farra attempted to explain "the differences between bipolar symptoms and anxiety issues." Tr. 924.

Dr. Kern's April 3, 2008 findings were virtually identical to those in January and February 2008; he again noted that Plaintiff was congenial and relaxed and opined that Plaintiff's bipolar disorder was "close to baseline." Tr. 948. That same day, Dr. Kern completed a mental RFC questionnaire, in which he diagnosed Plaintiff with bipolar disorder, manic, and alcohol dependence; assigned him a GAF score of 40; and gave him a fair prognosis. He indicated that the clinical findings in support of his opinion were Plaintiff's "[e]xtreme mania that characterized his hospitalization," but noted that he was "much better, insight better." Tr. 815. Dr. Kern further noted that Plaintiff was drinking less, but was "still unfocused, impersistent, [and] impatient." *Id*.

Dr. Kern opined that Plaintiff was unable to meet competitive standards in all but three out of sixteen enumerated abilities to perform unskilled work. He opined that he was seriously limited, but not precluded, in his ability to: make simple, work-related decisions; ask simple questions or request assistance; and get along with peers without unduly distracting them or showing behavioral

extremes. Dr. Kern opined that Plaintiff was unable to meet competitive standards in the economy for remembering work-like procedures; understanding, remembering, and carrying out very short and simple instructions; maintaining regular attendance and being punctual within customary tolerances; sustaining an ordinary routine without special supervision; working in coordination with or proximity to others without being unduly distracted; completing a normal workday and work week without interruptions from psychologically-based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; accepting and responding appropriately to criticism from supervisors; responding appropriately to changes in a routine work setting; dealing with normal work stress; being aware of normal hazards and taking appropriate precautions; maintaining socially appropriate behavior; traveling in an unfamiliar place; and using public transportation. In support of his opinion, Dr. Kern stated that Plaintiff had "lasted only very briefly in many work settings due to restlessness, inability to focus and concentrate and take direction–this much like what seen in office." Tr. 818. Dr. Kern also opined that Plaintiff's alcohol abuse did not contribute to his limitations. Finally, Dr. Kern opined that Plaintiff would miss work more than four days per month.

That same day, Plaintiff saw Dr. Farra and reported that a close family member had died, his sister was moving out-of-state, and he was discontent with a woman he had been dating. Dr. Farra noted that Plaintiff's mood continued to be "mildly dysphoric"(having an unpleasant mood), and that his motivation was diminished, but that he had a fair level of insight. Two weeks later, Plaintiff complained of ambivalence about getting a job and decreased energy, resulting in social isolation and decreased activity. Dr. Farra "[d]iscussed the lifestyle factors which appear[ed] to contribute to" these complaints. Tr. 951.

Dr. Kern's treatment notes from May 7, 2008, were virtually identical to his notes from January, February, and April 2008. That same day, Plaintiff reported to Dr. Farra that he had recently returned from helping his sister move; that he had excessive sleep; and that he continued to struggle with motivation, exercise, and social contact. Dr. Farra observed "neurovegetative symptoms of depression, including hypersomnia and lack of motivation/energy." Tr. 955. He discussed lifestyle changes and a plan that Plaintiff would exercise three times a week.

In June, July, and September 2008, Plaintiff reported to Dr. Kern that he was not very active, but he was medication compliant and denied any manic or depressive symptoms. Dr. Kern again opined that Plaintiff's bipolar disorder was "close to baseline."

In October 2008, Dr. Kern again completed a questionnaire, in which he maintained his previous diagnoses, prognosis, and GAF score. But this time, he indicated that the clinical findings in support of his opinion were Plaintiff's labile mood and difficulty with concentration and attention. This time, Dr. Kern opined that Plaintiff was unable to meet competitive standards in seven out of sixteen enumerated abilities to perform unskilled work: maintaining his attention for a two-hour segment; maintaining regular attendance and punctuality within customary tolerances; sustaining an ordinary routine without special supervision; working in coordination with or near others without being unduly distracted; performing at a consistent pace without an unreasonable number of rest periods; accepting instructions and responding appropriately to criticism from supervisors; and dealing with normal work stress.

He opined that Plaintiff was seriously limited in, but not precluded from, performing seven enumerated abilities: remembering work-like procedures; understanding and remembering very short, simple instructions; completing a normal workday and week without interruptions from

13

psychological symptoms; asking simple questions or requesting assistance; getting along with peers without unduly distracting them or showing behavioral extremes; responding appropriately to changes in a work setting; and being aware of normal hazards. Finally, Dr. Kern opined that Plaintiff was limited, but had a satisfactory ability to carry out very short and simple instructions and to make simple, work-related decisions.

In support of this opinion, Dr. Kern stated that Plaintiff "[d]emonstrated problems through [sic] years with being able to manage demands of work situation, e.g., interpersonal conflict, sustaining work routine." Tr. 969. Unlike his April 2008 response, Dr. Kern opined that Plaintiff's alcohol abuse contributed to his limitations because he "may be less able to attend to the needs of workplace" and that if Plaintiff totally abstained from alcohol, he would be "more likely to remain psychiatrically stable." Tr. 970. Finally, Dr. Kern opined that Plaintiff would miss work an average of one day of work per month.

### C. Vocational Expert Testimony

The vocational expert ("VE") testified that Mr. Halik's past work fell into two categories: carpet cleaning, SVP 3, semi-skilled, and performed at the heavy exertional level; and delivery truck driver, SVP 3, semi-skilled, performed at the medium exertional level.

The ALJ presented several hypothetical questions to the VE, asking whether there would be jobs available to a person with the specific limitations included. First, the ALJ presented the profile of an individual who had no exertional limitations, but was limited to performing simple, routine, and repetitive tasks, while employed in a low-stress job with relaxed or flexible production rate requirements. The VE testified that this person would be capable of performing janitorial work (85,000 jobs) and warehouse work (33,000 jobs). Next, the ALJ asked about a person with the same

limitations from the first, except that the person would be further limited to only occasional interaction with the public and co-workers. The VE stated that his answer would not change from the first hypothetical. The ALJ then asked the VE to assume the same limitations in the previous question, except that the person would never be able to interact with the public. The VE testified that the same jobs would be available, but the janitorial job would be reduced.

Finally, the ALJ asked about a person who could not sustain sufficient concentration, persistence, or pace to do even simple, routine tasks on a regular and continuing basis, for eight hours a day, five days a week, for a forty-hour work week. The VE testified that this person would not be able to perform any jobs in the economy. Counsel then proposed to the VE a person who is unable to meet the competitive standards to accept instructions or respond appropriately to criticism from supervisors, and the VE testified the person would be unemployable.

## STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ's findings are supported by substantial evidence and under the correct legal standard. *See Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000). If an error of law is committed by the Commissioner, then the "court must reverse the decision regardless of the volume of evidence supporting the factual findings." *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

An ALJ must articulate, at a minimum, his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). The ALJ must build an "accurate and logical bridge from the evidence to his conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004) (quoting *Scott*, 297 F.3d at 595); *see also Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (citing *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that he suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To be found disabled, the claimant's impairment must not only prevent him from doing his previous work, but considering his age, education, and work experience, it must also prevent him from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The steps are: (1) Is the claimant engaged in substantial gainful activity? If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to Step 2; (2) Does the claimant have an impairment or combination of impairments that are severe? If not, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to Step 3; (3) Does the impairment(s) meet or equal a listed impairment in the appendix to the regulations? If yes, the claimant is automatically considered disabled; if not, then the inquiry proceeds to Step 4; (4) Can the claimant do the claimant's past relevant work? If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to Step 5; (5) Can the claimant perform other work given the claimant's residual functional capacity ("RFC"), age, education, and experience? If yes, then the claimant is

not disabled, and the claim is denied; if no, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At the fourth and fifth steps, the ALJ must consider an assessment of the claimant's residual functional capacity ("RFC"). "The RFC is an assessment of what work-related activities the claimant can perform despite [his] limitations." *Young*, 362 F.3d at 1000. The ALJ must assess the RFC based on all the relevant evidence of record. *Id.* at 1001 (citing 20 C.F.R. § 404.1545(a)(1)). The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ. *Id.* at 1000; *see also Zurawski*, 245 F.3d at 886; *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## ANALYSIS

Plaintiff seeks reversal and remand of the ALJ's decision on three grounds, arguing that the ALJ made independent medical determinations and improperly weighed treating source opinion, made an erroneous credibility determination, and erred in his residual functional capacity finding. The Court considers each ground in turn.

### A. Independent Medical Determinations and Weight of Treating Source Opinion

Plaintiff argues that the ALJ made independent medical determinations not supported by the evidence and also failed to give controlling weight to Dr. Kern's opinion in violation of SSR 96-2p and 20 CFR 404.1527(d).

*1. Independent Medical Determinations*

The Seventh Circuit has repeatedly held that ALJs are not to make their own independent medical findings. *See Myles v. Astrue*, 582 F.3d 672, 677-78 (7th Cir. 2009); *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996).

In this case, Plaintiff argues that three specific statements constitute independent medical findings by the ALJ regarding Plaintiff's alcohol abuse and bipolar disorder. From these statements, Plaintiff concludes that "the ALJ found Mr. Halik's bipolar symptomatology to be a direct result of alcohol use," Pl. Br. at 9, and argues that *Kangail v. Barnhart*, 454 F.3d 627 (7th Cir. 2006), requires reversal.

However, *Kangail* is distinguishable from the present case because the ALJ in each case treated the impact of the concurrent alcohol and/or drug use on the bipolar disorder in a fundamentally different manner. In *Kangail*, the ALJ determined that the claimant was barred by statute from obtaining benefits because the ALJ found that the claimant's alcohol and drug abuse *caused* her bipolar disorder. *Kingail*, 454 F.3d at 628 (citing 42 U.S.C. § 423(d)(2)(C) ("An individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled.")). Similarly, in *Minnifield v. Astrue*, No. 1:09-CV-35, 2010 WL 148244, at * 1, 8 (N.D. Ind. Jan. 12, 2010), another case relied on by Plaintiff for the same principle, the ALJ found that the plaintiff's substance abuse was a contributing factor material to his disability.

In contrast, the ALJ in this case did not find that Plaintiff's alcohol abuse caused or brought about his bipolar disorder. The ALJ does not rely on § 423(d)(2)(C), and, in fact, makes the opposite finding:

> Further, while I find that the claimant's alcohol use does adversely impact on his bipolar disorder, as noted by Dr. Kern, I do not find that impact to be of a disabling extent. Were the impact to be to the extent that the claimant was disabled, alcohol would be a contributing factor material to the disability and the claimant could not receive benefits. Instead, I find that the claimant is not disabled in any event (regardless of his continued abuse of alcohol).

Tr. 67. Rather, the ALJ recounted Plaintiff's medical history and recognized, based on the evidence of record, that Plaintiff was stable while on his medications and that all of Plaintiff's hospitalizations and exacerbations of his bipolar symptoms were preceded by excessive alcohol use, leading to noncompliance with taking his medication.

The first two statements by the ALJ that Plaintiff describes as "playing doctor" are that Plaintiff's "anger and loss of self control are always related to alcohol use," Tr. 68, and that "[a]ll of the claimant's hospitalizations or exacerbations of symptoms have been connected with excessive drug and/or alcohol use leading to non-compliance with medication. It is abundantly clear that when taking his medication [as] prescribed the claimant is stable," Tr. 69. The ALJ came to these conclusions following over four pages discussing in detail the evidence of record. First, the ALJ referenced Dr. Farra's notation that, according to Plaintiff, he would enter cycles of binge drinking, which led to him becoming noncompliant with his medicine, which in turn triggered manic episodes. The ALJ also discussed the evidence showing that when Plaintiff was sober or drinking less alcohol he tended to be compliant with his medications. The ALJ noted that Plaintiff was hospitalized in 2005 for decompensation and bipolar disorder due to medication non-compliance. The ALJ also noted that at the time of discharge, Dr. Gallagher stressed the importance of abstaining from alcohol and that Plaintiff was euthymic, calm, cooperative and not manic or depressed, that Plaintiff had no hallucinations or delusions, that his insight, judgment, and memory were intact, and that he had good contact with reality with a GAF of over 60. The ALJ noted that Plaintiff continued to do well on his medication from April through July 2005 and that Plaintiff had not been drinking and that the subsequent notes showed that Plaintiff continued to be stable through April 2006. The ALJ recognized the findings in October 2006 that Plaintiff's bipolar disorder was stable but that his

alcohol dependence was not really under control and that he was subsequently hospitalized where it was noted that Plaintiff had been drinking and had not been taking his lithium. The ALJ noted that, in November 2006, Plaintiff was still drinking but was taking his medication and was stable. The ALJ recognized that the doctor's impression in December 2006 was that Plaintiff's bipolar disorder was more stable on the present medications but that his alcohol dependence was not under control. The ALJ acknowledged Dr. Kern's November 2006 opinion that Plaintiff was disabled.

The ALJ continued with Dr. Kern's opinion in April 2007 that Plaintiff's bipolar disorder remained stable but his alcohol dependence was not really under control and that Plaintiff could do okay on lithium alone if he were compliant with the lithium. The ALJ noted that Plaintiff was arrested for driving under the influence in September 2007. He recognized that Plaintiff stated he had been drinking daily for a month and that he had sometimes not been taking his medication, which Dr. Kern indicated in October 2007. The ALJ noted that on December 3, 2007, Plaintiff "reported cycles of binge drinking which lead to non-compliance with medication which triggered manic episodes." Tr. 65. The ALJ recognized Dr. Farra's opinion that Plaintiff's anger/rage was "clearly triggered by alcohol use but that his pattern had yet to be fully understood in the context of his bipolar disorder." *Id*. The ALJ noted that in January 2008, Plaintiff's mood was stable, he was sober, and his bipolar disorder was "close to baseline." *Id*.

The ALJ summarized Dr. Kern's Mental Residual Functional Capacity ("MRFC") conclusions from April 3, 2008, including his finding that alcohol or substance abuse did not contribute to Plaintiff's limitations. The ALJ felt this MRFC finding was "in stark contrast" with Dr. Kern's April 2008 record that Plaintiff's affect was stable. The ALJ noted that Plaintiff continued to remain stable through September 2008. The ALJ then summarized Dr. Kern's October

2008 MRFC findings, including his finding that alcohol and substance abuse did contribute to Plaintiff's limitations, that while using alcohol Plaintiff might be less able to attend to the needs of the work place, and that if he were abstinent, he would be more likely to remain psychologically stable.

Finally, Plaintiff identifies the phrase "[i]t was not [Plaintiff's] symptoms that were triggering his drinking," Tr. 70, as the third example of the ALJ playing doctor. However, this sentence is taken from the context of the ALJ's credibility discussion analyzing the intensity, persistence, and limiting effects of Plaintiff's symptoms as required by SSR 96-7p, including a lengthy discussion of the interrelationship between Plaintiff's alcohol use and his bipolar disorder based on the evidence of record, part of which provides:

> Most significantly, I note that the claimant continues to drink alcohol despite repeated admonitions by his treating doctor to stop. He also is noted in the record to have periods of non-compliance with medication. He acknowledged his own understanding that when he had drinking binges he would not take his medication which would trigger an exacerbation of symptoms. It was not his symptoms that were triggering the drinking. Despite the repeated notations that he should stop drinking the claimant failed to complete a substance abuse program at Southlake, failed to continue with AA and completed classes only insomuch as he could regain his driver's license.

Tr. 70. Plaintiff correctly notes that nowhere in the record does Dr. Kern or any other doctor opine that Plaintiff's bipolar disorder was precipitated or initiated by substance abuse; neither does the ALJ. The ALJ recognized the evidence in the record showing that alcohol use caused Plaintiff to stop taking his medications, which in turn cycled Plaintiff into his bipolar symptoms. Each of the three identified statements are supported by the evidence of record, and in explaining the medical evidence of record, the ALJ has created a logical bridge between the evidence and his findings.

22

*2. Weight of Treating Source Opinion*

Plaintiff next argues that the ALJ gave insufficient weight to Dr. Kern's opinion. An ALJ must give the medical opinion of a treating doctor controlling weight as long as the:

> treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record . . . . When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons . . . for the weight we give to your treating source's opinion.

20 C.F.R. § 404.1527(d)(2); *see also* 20 C.F.R. § 416.927(d)(2); *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008); *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006); SSR 96-8p; SSR 96-2p. The referenced factors listed in paragraphs (d)(2)(i) through (d)(6) are the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency, specialization, and other factors such as the familiarity of a medical source with the case. 20 C.F.R. §§ 404.1527(d), 416.927(d).

Courts have acknowledged that a treating physician is likely to develop a rapport with his or her patient and may be more likely to assist that patient in obtaining benefits. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). An ALJ is entitled to discount the medical opinion of a treating physician if it is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as the ALJ is able to "minimally articulate his reasons for crediting or rejecting evidence of disability." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Clifford*, 227 F.3d at 871; *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001); quoting *Clifford*, 227 F.3d at 870). If the ALJ makes a reasoned choice between disparate

medical findings, it is beyond the capacity of the Court to review because of the deference afforded the ALJ's decisions. *Gaylor v. Astrue*, 292 F. App'x 506, 512 (7th Cir. 2008). It is the ALJ's responsibility to weigh conflicting evidence and to make a determination on disability, and the ALJ has a responsibility to confront the evidence in Plaintiff's favor and explain why it is not persuasive. *Id.* at 512, 513.

In this case, Plaintiff argues that the ALJ substituted his own medical judgments for those articulated by Dr. Kern, Plaintiff's treating physician, in his medical source statements on the MRFC assessments. Given the evidence of record, it was within the ALJ's discretion to give some of those statements less weight, and in doing so, he applied the appropriate factors and sufficiently explained his decision. First, the ALJ specifically noted Dr. Kern's specialty and stated the length and frequency of his treatment relationship with Plaintiff, recognizing that these factors give weight to Dr. Kern's opinion as required by 20 C.F.R. § 404.1527(d).

Second, Plaintiff contends that the ALJ did not rely on any other medical source in making his determination, but rather that he gave cursory treatment to the required factors. The Seventh Circuit has held that "an ALJ must consider the entire record, but the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians." *Schmidt*, 496 F.3d at 845. While the ALJ's discussion of the factors was brief, it was thorough, and the assertion that the ALJ did not rely on any other medical source is inaccurate. After examining the medical and nonmedical evidence as a whole, the ALJ reasonably determined that Dr. Kern's opinion was inconsistent with Dr. Farra's treatment notes, the opinions of the state agency reviewing physicians, and Dr. Kern's own treatment notes.

The ALJ considered Dr. Farra's notes opining that Plaintiff's anger was clearly triggered by alcohol abuse but that the cause of his irritability was not yet fully understood outside the context of his bipolar disorder. Additionally, the ALJ found that Dr. Kern's opinions were contravened by those of the state agency reviewing psychologist, who opined that Plaintiff's impairments did not limit his activities in day-to-day living, somewhat limited his social functioning, and moderately limited his concentration, persistence, and pace. The psychologist also noted that Plaintiff had a history of using alcohol instead of adhering to his medication requirements, and further opined that Plaintiff was capable of simple repetitive tasks when he was sober. Regarding Dr. Kern's own notes, the ALJ observed that the notes did not contain references to Plaintiff having decreased concentration or attention, nor did they contain notes of Plaintiff complaining of these symptoms despite a conclusion that Plaintiff had "lasted only very briefly in many work settings due to restlessness, inability to focus and concentrate and take direction–much like what seen in office." Tr. 818. Plaintiff argues that Dr. Kern was not required to make such a notation, but the ALJ has the discretion to compare Dr. Kern's findings with the record as a whole and note inconsistencies. 20 C.F.R. § 404.1527(d)(4). Moreover, this notation was only one of many factors the ALJ used in weighing the evidence as set forth throughout this section.

The Plaintiff also contends that the ALJ misinterpreted Dr. Kern's findings that Plaintiff was stable for the two years since his alleged onset date. The ALJ noted that Dr. Kern indicated in each of his visit reports that Plaintiff was stable during this time period, and also that Plaintiff's bipolar symptoms were approaching baseline. A review of Dr. Kern's notes shows that he is recording Plaintiff's and Plaintiff's father's reports at the time of ongoing stability between sessions related to his bipolar disorder, not simply an observation of Dr. Kern's that Plaintiff was stable during the

session.  In his brief, Plaintiff attempts to downplay his own reports of ongoing stability by noting his symptomatology recorded by Dr. Farra during the same time period such as feelings of anxiety and anticipated incompetence/failure, mood continues to be mildly dysphoric, diminished motivation, and diminished energy resulting in decreased physical activity and social isolation.  However, Plaintiff does not explain how these symptoms are inconsistent with stability.  The ALJ did not interpret Plaintiff's bipolar disorder as stable and approaching baseline status to mean that Plaintiff was completely rid of his symptoms or even that Plaintiff was well.  Rather, the ALJ recognized that Plaintiff was having fewer episodes and, thus, was capable of work within the ALJ's RFC finding.

In support of his argument that the ALJ placed too much emphasis on the "stable" and "baseline" remarks made by Dr. Kern, Plaintiff cites three cases, each of which is distinguishable from the case at hand.  In *Bauer v. Astrue*, the ALJ committed error by relying too heavily on hopeful remarks made by the plaintiff and her doctor.  532 F.3d at 608.  The same cannot be said of the present case.  The findings by Dr. Kern that Plaintiff was "stable" and that his bipolar disorder was "near baseline" were conclusions based on Plaintiff's ongoing status rather than simply hopeful remarks like those in *Bauer* such as "the plaintiff's memory was 'ok,' her sleep fair, she was doing 'fairly well,' her 'reported level of function was found to have improved,' she had 'a brighter affect and increased energy,' she 'was doing quite well.'"  *Id.* at 609.  Nor was the ALJ's decision based solely on these findings but rather took into account the medical and nonmedical evidence as a whole.

Second, in *Kangail*, commenting that bipolar disorder is episodic, the Seventh Circuit held that the ALJ erred by finding an inconsistency in the physician's testimony opining that the

plaintiff's bipolar disorder was severe when she behaved normally in office visits. 454 F.3d at 629.

In this case, the ALJ considered the entirety of the record, including the opinions of Dr. Farra and the reviewing psychologist, and did not conflate Plaintiff's stability in the office as evidence of Plaintiff's wellness. As noted above, Dr. Kern's observations of "stability" were as to Plaintiff's ongoing bipolar disorder, not simply his status in the office. Finally, in *Micus v. Bowen*, which Plaintiff raises in the context of discrediting the ALJ's RFC finding, the court found that the ALJ erred when he treated the plaintiff's statements that she felt "well" as objective evidence of her ability to work and lack of disability, with the Court describing the plaintiff's use of "well" as a "social pleasantry." 979 F.2d 602, 606 (7th Cir. 1992). Plaintiff argues that the ALJ interpreted "stable" to mean that Plaintiff had "no problem in concentration," when Plaintiff believes it simply means that Plaintiff's condition had not changed. Pl. Br., p. 17. The Court finds no error in the meaning the ALJ took from Dr. Kern's findings of "stable" and "baseline" to mean that Plaintiff's bipolar disorder was controlled with medication. Accordingly, the ALJ did not err in the weight he gave to Dr. Kern's medical source statements.

## B. Credibility Finding

Plaintiff contends that the ALJ did not properly assess Plaintiff's credibility according to SSR 96-7p. Specifically, the Plaintiff argues that the ALJ disregarded Plaintiff's allegations based entirely on evidence of alcohol use; the ALJ failed to consider whether the Plaintiff's non-compliance with treatment was related to his bipolar disorder; and the ALJ determined the Plaintiff's RFC first, and then determined that the Plaintiff's testimony was inconsistent with the RFC finding.

An ALJ is in the best position to observe witnesses and to make an appropriate evaluation as to their credibility. *Skarbek*, 390 F.3d at 504. Thus, a reviewing court will not reverse an ALJ's

credibility determination unless it is "patently wrong." *Schmidt*, 496 F.3d at 843 (quoting *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003)). In making a credibility determination, Social Security Ruling 96-7p provides that the ALJ must consider the record as a whole, including objective medical evidence; the claimant's statements about symptoms; any statements or other information provided by treating or examining physicians and other persons about the conditions and how they affect the claimant; and any other relevant evidence. *See* SSR 96-7p.

Factors to be considered by an ALJ evaluating a claimant's complaint of pain or symptoms in addition to objective medical evidence include:

(i)     The claimant's daily activities;
(ii)    The location, duration, frequency, and intensity of the claimant's pain or other symptoms;
(iii)   Factors that precipitate and aggravate the symptoms;
(iv)    The type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms;
(v)     Treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms;
(vi)    Any measures other than treatment the claimant uses or has used to relieve pain or other symptoms (*e.g.*, lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
(vii)   Any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 96-7p at *3.

In the present case, Plaintiff's alcohol use was a significant factor in the ALJ's credibility finding, but was far from being the only determining factor. The ALJ also considered Plaintiff's lack of manic episodes since 2006; Plaintiff's continuing search for employment "signifying a tacit belief that he is capable of working at least some kind of job," Tr. 70; and Plaintiff's daily activities, which included spending time with friends and family, doing laundry and other household chores, making his meals, drawing, and going to the mall.

Plaintiff asserts that the ALJ engaged in a boilerplate recitation that the Plaintiff's testimony was not credible, and then rejected the rest of Plaintiff's testimony due to alcohol use, contrary to established Seventh Circuit case law. *See McClesky v. Astrue*, 606 F.3d 351, 352 (7th Cir. 2010) (reversing where the ALJ used boilerplate language to find the plaintiff not fully credible). However, the lack of boilerplate language in the ALJ's credibility finding is evidence that the ALJ did not make a post-hoc or selective credibility determination in order to fit his RFC finding as suggested by Plaintiff, who relies on *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783 (7th Cir. 2003). Unlike in *Brindisi*, in which the Seventh Circuit found the ALJ had failed to meet the requirements of SSR 96-7p because the ALJ failed to cite to any record evidence and simply made a conclusory credibility determination, *Brindisi*, 315 F.3d at 787-88, the ALJ in this case avoided simple conclusory determinations and fully supported his credibility determination with a thorough analysis, identifying multiple factors considered in reaching the credibility finding rather than merely dismissing the Plaintiff's allegations.

Finally, Plaintiff argues that the ALJ committed legal error by not considering the possibility that Plaintiff's bipolar disorder was a potential cause of his medicine noncompliance. *See Kangail*, 454 F.3d at 630-31 (holding that the ALJ erred by not considering the possibility that the plaintiff's bipolar disorder prevented the plaintiff from seeking treatment); *see also Peevy v. Astrue*, No. 1:08-CV-111, 2009 WL 721680, at *8 (N.D. Ind. Mar. 18, 2009) (holding that the ALJ erred by not considering the possibility that the plaintiff's major depression prevented her from seeking treatment). However, the ALJ did not discount Plaintiff's credibility for noncompliance with his medication or treatment for his bipolar disorder. Rather, the ALJ was concerned with Plaintiff's continued failure to follow treatment for his alcohol abuse. The ALJ found that Plaintiff's failure

to follow his physicians' admonitions to stop drinking, his failure to continue attending AA meetings, and his failure to complete a substance abuse program at Southlake "significantly diminishe[d] his credibility to the extent of limitations related to his bipolar disorder." Tr. 70. This finding is in accord with SSR 96-7p, which provides that "the individual's statements may be less credible if . . . the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure." SSR 96-7p at *7.

Moreover, even if the ALJ had discounted Plaintiff's credibility based on his medication noncompliance, as discussed in Part A.1 above, the ALJ conducted a thorough review of the evidence of record which showed that Plaintiff's noncompliance with medication resulted from his abuse of alcohol. The ALJ did not make the same error as the ALJ in *Kangail* who attributed the claimant's bipolar disorder to his alcohol abuse. Nor, unlike the plaintiff in *Minniefield*, has Plaintiff pointed to any evidence in his medical record that suggests his failure to be compliant with his medications following alcohol use was a result of his bipolar disorder. *See* 2010 WL 148244, at *7-8. In his January 2008 notes, Dr. Farra does indicate that he and Plaintiff "[w]orked to identify how manic symptoms often relate to loss of control, excessive substance use, and inability to maintain employment." Tr. 930. However, there is no causal relationship opined in that statement, but rather an acknowledgment that they discussed the interrelationship of elements. It was within the ALJ's discretion to find that Plaintiff's repeated failure to take reasonable steps towards treating his alcohol abuse diminishes Plaintiff's credibility.

## C. RFC Finding

The RFC is a measure of what an individual can do despite the limitations imposed by his impairments. 20 C.F.R. § 404.1545(a). The determination of a claimant's RFC is a legal decision

rather than a medical one. 20 C.F.R. § 404.1527(e)(2); *Diaz*, 55 F.3d at 306 n. 2. The RFC is an issue at Steps Four and Five of the sequential evaluation process. SSR 96-8p. "The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* The ALJ's RFC finding must be supported by substantial evidence. *Clifford*, 227 F.3d at 870. If the RFC conflicts with a medical source opinion, the ALJ must explain why the opinion was not adopted. SSR 96-8p. Plaintiff argues that the ALJ's RFC assessment did not accurately reflect Plaintiff's limitations and was legally insufficient under SSR 96-8p as to Dr. Kern's opinions that Plaintiff was severely limited in his ability to concentrate and that Plaintiff could not meet standards in working with others and with supervisors.

First, Plaintiff notes that Dr. Kern opined that Plaintiff could not meet competitive standards in maintaining regular attendance and being punctual and dealing with normal work stress. As discussed in detail above, the ALJ properly considered the record as a whole and sufficiently articulated the reasons for the weight given to Dr. Kern's opinion. Thus, the ALJ reasonably determined that Plaintiff was capable of operating in a simple, low stress environment with only occasional contact with coworkers or the public. The ALJ considered the objective medical evidence, Plaintiff's testimony, and the medical source opinions in making this finding and articulated a sufficient narrative discussion of the evidence to support his determination. In his conclusion, the ALJ determined that Plaintiff's

> stable bipolar disorder, the absence of manic or depressive episodes, his relaxed and congenial demeanor and his clear and logical thought processes all provide ample support for my residual functional capacity finding that the claimant can perform simple, routine, repetitive work, with no more than occasional interaction with coworkers or the general public in an environment where production rate requirements are relaxed or flexible.

Tr. 70. So long as the ALJ builds a logical bridge to his findings, it is beyond this Court's discretion to reverse the ALJ.

Second, Plaintiff identifies Dr. Kern's opinion that Plaintiff could not meet standards in working in coordination with or in proximity to others without being unduly distracted and in accepting instructions and responding appropriately to criticism from supervisors. The Vocational Expert testified that someone with these limitations would be unemployable. Although the ALJ found that Plaintiff was limited to only occasional contact with coworkers or the general public, he failed to address the limitation on contact with supervisors. This issue is especially critical in this case, where both Dr. Kern's medical source statements and Plaintiff's testimony demonstrate that Plaintiff consistently struggled with maintaining a proper relationship with his supervisors across multiple jobs. The ALJ committed legal error by failing to discuss this aspect of Dr. Kern's medical source statements by not addressing the limitation on contact with supervisors in RFC determination. This error is substantially similar to *Young v. Barnhart*, where the Seventh Circuit found that the ALJ committed legal error because, although the "RFC requires that Young have limited contact with the public and coworkers, it says nothing of limiting contact with supervisors, despite the fact that there was substantial evidence within the record that Young has difficulty accepting instruction, responding appropriately to criticism, and interacting with others on the job." 362 F.3d at 1002, 1003. If the ALJ determined from the record as a whole that Plaintiff was not as limited in contact with supervisors as opined by Dr. Kern, he was required to articulate his reasoning. On remand, the ALJ must consider Plaintiff's limitation regarding supervisor contact when he considers Dr. Kern's opinions, the vocational expert's testimony, and Plaintiff's RFC.

## CONCLUSION

Based on the foregoing, the Court **GRANTS** the Motion for Summary Judgment [DE 10].

The decision of the ALJ is **REVERSED** and **REMANDED** for further proceedings consistent with this Order.

So ORDERED this 30th day of September, 2010.

s/ Paul R. Cherry                                    
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:  All counsel of record